# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Rico L.*, 2012 IL App (1st) 113028

---

| | |
|---|---|
| Appellate Court Caption | *In re* RICO L., a Minor, Respondent-Appellee (The People of the State of Illinois, Petitioner-Appellee, v. Bernadine L., Respondent-Appellant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-3028 |
| Opinion filed | July 27, 2012 |
| Rehearing denied | August 31, 2012 |
| Opinion withdrawn | August 31, 2012 |
| Opinion filed | September 14, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The best interests of respondent minor warranted the trial court's rulings, which initially found him dependent, made him a ward of the court, and placed guardianship with the Department of Children and Family Services, but then a short time later returned guardianship to his mother under a protective supervision order, and then, after an evidentiary hearing, vacated the protective supervision order, which reverted custody to the Department, and issued a modified dispositional order finding respondent's mother "unable" to provide for him. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-JA-173; the Hon. Bernard J. Sarley, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Anita M. Alvarez, State's Attorney, of Chicago (Alan Spellberg, Mary
Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel),
for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Jean M.
Agathen, of counsel), guardian *ad litem*.

Mark J. Heyrman, Amy J. Beaux and Andrea M. Patton, law students, all
of Edwin F. Mandel Legal Aid Clinic, of Chicago, *amicus curiae*.

Panel

JUSTICE GARCIA delivered the judgment of the court, with opinion.
Justice Palmer concurred in the judgment and opinion.
Justice Gordon dissented, with opinion.

**OPINION**

¶ 1 Mother-respondent-appellant, Bernadine L., appeals the circuit court's ruling of September 27, 2011, vacating a protective supervision order that returned custody of her minor son, Rico, to the Guardianship Administrator of the Department of Children and Family Services (DCFS). On March 17, 2010, DCFS was awarded temporary custody of Rico when Bernadine refused to pick up Rico after he was medically cleared for discharge following his fourth hospitalization for psychiatric problems. At the adjudication hearing on October 19, 2010, the court found Rico to be a dependent minor under section 2-4 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-4 (West 2010)) in that he "is without proper medical or other remedial care recognized under State law or other care necessary for his *** well being through no fault, neglect, or lack of concern" of Bernadine. At the dispositional hearing on November 9, 2010, the court determined it was in Rico's best interests that he be adjudged a ward of the court. The court placed Rico under DCFS guardianship in accordance with section 2-27 of the Act (705 ILCS 405/2-27 (West 2010)), as Bernadine was unable "for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor." Rico remained at the residential home where DCFS placed him following its receipt of temporary custody. On June 17, 2011, custody of Rico was returned to Bernadine under the protective supervision order entered pursuant to section 2-24 of the Act (705 ILCS 405/2-24 (West 2010)). On September 27, 2011, at the hearing scheduled for possible closure of the case, the court was informed that Rico was once again hospitalized for psychiatric problems. After hearing testimony from a DCFS caseworker and Bernadine and providing the parties the opportunity to present any additional evidence, the juvenile court vacated the section 2-24 protective supervision order, which returned guardianship of Rico to DCFS, and entered a modified disposition order pursuant

-2-

to section 2-27 of the Act.

¶ 2    Bernadine initially challenges the juvenile court's orders of September 27, 2011, as procedurally improper. She contends the court erred in vacating the protective supervision order under which she regained custody of Rico, where no express finding was made that she violated any term of the order. Also, Bernadine complains that the court proceeding of September 27, 2011, failed to set out the statutorily mandated, written "factual basis" that she was unable to care for Rico "for some reason other than financial circumstances alone" as compelled by section 2-27 of the Act and that the assistance she received from her counsel was constitutionally ineffective. We find no merit to any of Bernadine's contentions and affirm.

¶ 3                                                    BACKGROUND

¶ 4    Bernadine, at the age of 37, decided to become a foster parent following her divorce. She has a degree in business administration and has worked in the accounting department of a private corporation for 21 years. Bernadine resides in a four-bedroom, single family home in Chicago. She obtained her foster home license in 1999.

¶ 5    Born September 29, 1996, Rico was physically abused and abandoned by his biological parents. He was initially placed with Bernadine for six months beginning in September 2000. He was returned to her home in June 2001, where he remained. On September 29, 2003, the Social Security Administration determined Rico to be disabled, which made him eligible for services and financial support to assist with his care. On April 4, 2007, Rico received a DCFS adoption subsidy determination. The adoption subsidy entitled Rico to individual in-home counseling, medication monitoring, and educational support services.

¶ 6    On June 7, 2007, Bernadine adopted Rico and his younger brother, Rudolph. Beginning in 2008, the family received postadoption services, including individual and family counseling.

¶ 7    In June 2008, Bernadine had Rico psychiatrically hospitalized at Riveredge Hospital for one month after he allegedly hit Bernadine's 80-year-old mother with her cane. Rico was 11 years of age. Rico had reportedly been angry at his grandmother after she would not let him wash the dishes. Bernadine's neighbor and Chicago police officers that responded to the call for assistance were unable to de-escalate Rico, which led to his hospitalization.

¶ 8    In August or September 2009, Rico allegedly attempted to "set the house on fire" by putting paper in an electrical outlet. He was taken to Chicago Lakeshore Hospital for psychiatric hospitalization.

¶ 9    On December 5, 2009, Rico was psychiatrically hospitalized at Hartgrove Hospital after he threatened to blow up his home. He reportedly placed aluminum foil into the microwave oven with the intent of blowing up the oven because, as was reported, "his grandmother was getting on his nerves." He also expressed suicidal thoughts and allegedly made a statement that "everyone would be happier if he [were] gone." During Rico's hospitalization, a clinical psychologist administered a psychological evaluation, which found Rico's IQ to be 82, in the low range of average intellectual functioning. The psychologist recommended that Rico be evaluated for attention deficit hyperactivity disorder.

¶ 10	On January 28, 2010, Bernadine had Rico readmitted to Hartgrove Hospital. He presented at Hartgrove with "enuresis [bed wetting], impulsivity, distractibility and poor historical recall." According to Bernadine, Rico was "eating and chewing objects such as batteries, pencils, wire, light bulbs and pens." Rico also kicked holes in the walls of Bernadine's home and ate the pieces of drywall. Bernadine expressed concern over Rico's statement that "It'd be better *** if I were not around."

¶ 11	On February 15, 2010, an anonymous call was made to DCFS's Child Abuse and Neglect Hotline alleging that Bernadine had refused to pick up Rico, who was medically cleared for discharge from Hartgrove Hospital. Upon an inquiry by DCFS, Bernadine indicated that she was unable to handle Rico's behavior and could not maintain him in her home. DCFS held a postadoption clinical staffing meeting on February 26, 2010, regarding Rico's status; DCFS recommended that Rico be placed in a group home or residential treatment facility.

¶ 12	On March 2, 2010, the State's Attorney's office filed a petition for adjudication of wardship and a motion for temporary custody regarding Rico. The petition alleged that Rico was dependent in that he was "without proper medical or other remedial care recognized under State law or other care necessary for his well-being through no fault, neglect or lack of concern by his parents, guardian or custodian." Specifically, the petition alleged:

> "This minor has been diagnosed with Impulse Disorder, Attention Deficit Hyperactivity Disorder, Bipolar Disorder and Mood Disorder. Minor has a history of psychiatric hospitalizations. Minor has been physically aggressive with his mother and other family members. Minor threatened to kill his mother and other family members. Mother is unable to care for this minor. There are no other relatives able to care for this minor. This is a single parent adoption."

¶ 13	Attached to the motion for temporary custody, DCFS investigator Frances Thomas averred in his affidavit that Bernadine had locked Rico out of her home. According to Thomas' affidavit, Bernadine was "fearful for her safety and all other household members in her home." Bernadine requested that DCFS take custody of Rico because she was experiencing high blood pressure as a result of her inability to care for Rico.

¶ 14	On March 17, 2010, the circuit court held a temporary custody hearing and found probable cause to support the State's petition, as well as an urgent and immediate necessity to remove Rico from Bernadine's home. The court awarded temporary custody of Rico to the DCFS Guardianship Administrator. Bernadine was granted day visits, either supervised or unsupervised at the discretion of DCFS. The public guardian was appointed to represent Rico as both attorney and guardian *ad litem* (GAL). On March 31, 2010, the court appointed attorney Douglas Rathe to represent Bernadine. The parties waived the six-month period for an adjudicatory hearing.

¶ 15	On April 12, 2010, DCFS transferred Rico from Hartgrove Hospital to a residential placement at Lydia Home. On April 15, a DCFS social worker conducted an "Integrated Assessment Interview" with Bernadine. Bernadine wanted Rico to come home after his treatment. She discussed her efforts at disciplining Rico. She would withhold privileges, such as games and sweets, and also make him perform push-ups and jumping jacks "to tire him out." Bernadine told DCFS that discipline "did not work with Rico and that the only thing

that worked was 'letting him do what he wanted.' " Bernadine expressed the desire to see her children " 'grow up, have an education, get a job and be successful and well.' " Regarding Rico's behavioral problems, Bernadine stated, "It's just day by day, minute by minute. I don't want to treat him different. I want him to be a part [of things] as opposed to being alone." Bernadine noted her surprise whenever Rico smiled or laughed. Bernadine admitted to being hurt initially by Rico's lack of affection, but she learned to accept this as the years passed. She told DCFS, "I know deep down he loves me."

¶ 16    DCFS assessed its impressions of Bernadine:

"[Bernadine] tried to create a stable and loving household for Rico to develop. She engaged him in activities she felt would be empowering and yield positive results. However, it seemed that she had limited insight into Rico's maladaptive behavior. During the IA interview, [Bernadine] admitted that she had not wanted to adopt Rico. She also felt that she lacked concrete support from DCFS, which probably added to her stress level and frustration. [Bernadine] used good judgment when she used various supports and resources to find services for Rico. She used good judgment when she took him to the psychiatric hospital during the periods he was in crisis. [She] used questionable judgment when she gave up physical custody of Rico despite being told that she could maintain custody and receive the help she needed for Rico. *** [Bernadine] also seemed to use poor judgment in her choice of discipline with Rico."

The assessment concluded that Bernadine "currently lacks the emotional capacity to parent an adolescent with Rico's emotional and behavioral needs."

¶ 17    DCFS interviewed Rico the same day. Rico claimed that Bernadine hit him with a belt and with her fist in his chest when he was 11. At the time Rico was 13. Rico denied hitting his grandmother with a cane, and described her as the only person at home he trusted. He admitted to chewing on nonfood items, such as rubber, but denied swallowing them. Rico reported that Bernadine was affectionate and told him that she loves him, but he also stated he did not like the manner in which she treated him sometimes. He described Bernadine as "mean." When asked to explain, Rico said that he did not like all of the push-ups she made him perform as punishment. Rico complained Bernadine "told too many lies about him." He indicated he was frustrated and angry about the lies told about him. He began to cry, after which he became withdrawn and verbally unresponsive.

¶ 18    The DCFS assessment team concluded that Bernadine had a strained relationship with Rico, who was often physically and verbally aggressive toward her and other family members. According to DCFS, Bernadine "has been unable to control Rico's maladaptive behaviors over the last several years and does not want him to return home. Although she realized that Rico's placement into a residential treatment facility was in his best interests, she expressed guilt about contacting DCFS for assistance and losing physical custody of him." Bernadine was willing to engage in reunification services, such as family therapy and visitation with Rico. DCFS reported its prognosis for Rico returning to Bernadine's home as "guarded."

¶ 19    On October 19, 2010, an adjudication hearing was held on a stipulation of facts of the parties. The parties stipulated that as of March 2010, "the minor was in need of a structured

setting more intensive than a home setting due to the fact that the minor was suicidal, physically aggressive, and eating nonnutritive objects." The stipulation provided that "[Bernadine] is unable to care for the minor in her home due to her concerns for the safety and well being of the minor as well as the other members of her home." Based on the stipulation, the circuit court found Rico to be a dependent minor pursuant to section 2-4 of the Act (705 ILCS 405/2-4 (West 2010)) in that he "is without proper medical or other remedial care recognized under State law or other care necessary for his *** well being through no fault, neglect, or lack of concern" of Bernadine. The court issued a finding of dependency based on "the minor's multiple mental health diagnoses and threatening behavior to family members and inability to de-escalate despite the adoptive mother's efforts to assist with the minor's diagnoses and behavior."

¶ 20    On November 9, 2010, the circuit court held a dispositional hearing, at which two caseworkers and Bernadine testified. Ronald Haynes, a caseworker at Lydia Home, testified that Rico was diagnosed with post-traumatic stress disorder, attention deficit disorder, depression, and enuresis. Rico received treatment for his diagnoses and was compliant with the medications he was prescribed. Rico received family therapy with his mother, known as "parent/child interaction therapy" (PCIT). According to Haynes, the therapy assisted Rico in making progress. Bernadine was also very compliant with all of Lydia Home's requests and those from the PCIT. Bernadine had unsupervised, off-site visits with Rico for eight hours at a time. No incidents were reported during the visits. Haynes stated that while the parties were making progress, Rico needed continued placement at Lydia Home. Haynes recommended that Rico be adjudged a ward of the court. He recommended a permanency goal of return home within 12 months as consistent with Rico's best interests.

¶ 21    Amelia Green testified that she was the DCFS caseworker assigned to Rico since the inception of his case. She stated that there were no signs of abuse or neglect of Rico at Lydia Home.

¶ 22    Bernadine testified that during the family therapy sessions, Rico told her about altercations or arguments he had with staff or roommates at Lydia Home. According to Bernadine, she did not observe any improvement in Rico's behavior from his stay at Lydia Home. Bernadine testified that she preferred Rico remain at Lydia Home until he completed the eighth grade in June 2011. She stated that she wanted Rico to come home when he was well enough.

¶ 23    Following the testimony, the circuit court determined it was in Rico's best interests that he be adjudged a ward of the court. The court found Bernadine was "unable for some reason other than financial circumstances alone to care for, protect, train or discipline" Rico. The court placed Rico under DCFS guardianship. The court informed Bernadine of her appeal rights. The court set Rico's permanency goal as return home within 12 months, based on Bernadine having "made substantial progress toward return home of this minor based on the evidence that I've heard." A permanency order was entered on November 9, 2010, consistent with the court's findings. Bernadine did not appeal.

¶ 24    On May 9, 2011, the circuit court entered a new permanency goal of return home within five months. The court's order stated that the parties "are in need of continued services

geared toward re-unification." The court scheduled another permanency hearing for June 17, 2011.

¶ 25    On June 10, 2011, Bernadine filed a motion requesting that Rico be allowed to return home. The motion alleged that Lydia Home was scheduled to discharge Rico on June 17, 2011, a few days after his eighth-grade graduation. According to the motion, Lydia Home staff concluded that Rico's discharge was appropriate so long as outplacement services were in place. The motion also submitted that DCFS agreed in court on May 9, 2011, with the return home recommendation. The only question was the date for the transition of Rico from Lydia Home to Bernadine's home.

¶ 26    On the date of the scheduled permanency hearing of June 17, 2011, the circuit court heard Bernadine's motion for Rico's return home. Haynes testified that since Rico's April 2010 placement at Lydia Home, he had been participating in individual therapy, family therapy, and medication monitoring for aggressive behavior. According to Haynes, the medication helped stabilize Rico. Haynes stated he was not ready to recommend Rico return to Bernadine's home because psychiatry appointments had yet to be confirmed. Haynes did not feel comfortable recommending return home until after a scheduled June 20 assessment and the assignment of a psychiatrist. Haynes confirmed that Bernadine wanted Rico returned home. Bernadine requested that Rico be placed in a therapeutic high school, but Lydia Home did not agree. According to Haynes, the Chicago Board of Education did not deem Rico fit for a therapeutic school. Haynes reported that Rico's Lydia Home psychiatrist recommended Rico return home, conditioned upon arranging for continued psychiatric services. Lydia Home would provide Rico with a 30-day supply of his medications if he were returned home after the permanency hearing. Haynes stated Rico enjoyed his visits with Bernadine and that Rico wanted to return home as well. Haynes concluded that it was in Rico's best interests that custody be returned to Bernadine.

¶ 27    DCFS caseworker Green testified that Bernadine would not have to worry about paying for services because services were in place in the event of a "return home" finding. Green agreed with Haynes' recommendation of return home, but only if "the psychiatrist is in place first."

¶ 28    Bernadine testified she believed Rico was ready to come home. She had diligently participated in all DCFS had asked of her and she had attended all court hearings. Bernadine contacted the agency where Rico received psychiatric counseling and medication monitoring before Rico came into the juvenile court system and she made an appointment to have Rico seen by a psychiatrist there. She stated that the agency accepted Rico's medical card. Bernadine was confident that everything would work out, and she was ready to take Rico home that day.

¶ 29    Rico told the circuit court that he was ready to go home.

¶ 30    In its findings, the circuit court reviewed all the evidence and indicated its familiarity with the progress Bernadine had made. The court found Bernadine fit and able to protect, care for, train, and discipline Rico. According to the court, reasonable efforts had been made to address the reasons for Rico's removal from Bernadine's home and appropriate services aimed at family preservation were successful. The court stated, "[I]t is no longer in the best

interest of the minor to be a ward of the state." The court, however, determined that Rico's best interests compelled an order of protective supervision under section 2-24 of the Act with the return of custody of Rico to Bernadine. The order of protective supervision required Bernadine "not use, or allow anyone else to use, any corporal punishment on the minor(s) (no spanking or hitting with any objects, including, but not limited to, belts, cords, sticks, fists or hands)." Bernadine was directed to provide proper care to Rico, cooperate with all reasonable requests of DCFS, and notify DCFS within 24 hours of any injury to Rico that required professional medical treatment. The written order included additional conditions that Rico attend all psychiatric appointments and take all prescribed medications. Finally, the court advised Bernadine that if she "were to fail to meet any of the conditions or violate any of the conditions, one of the possible consequences could be that Rico would be removed from the home again." Bernadine agreed to adhere to all the conditions of the protective supervision order, which she confirmed with her signature. The order remained in effect "until further order of the Court."

¶ 31    On August 19, 2011, the circuit court continued the case to September 27, 2011, for a progress report and a hearing to possibly close the case.

¶ 32    At the September 27, 2011 hearing, Bernadine's attorney, Douglas Rathe, informed the court that there had been an "unusual incident since the case returned home [on June 17]." According to Rathe, Rico had a "meltdown" in Bernadine's home, which required police involvement and Rico's psychiatric hospitalization at Hartgrove Hospital, where Rico remained.

¶ 33    DCFS caseworker Green testified that she was informed of the incident on August 31, 2011, by Rico's GAL. Green then contacted Bernadine, who told Green that Rico had attacked her. In response to Green's question as to what precipitated the incident, Bernadine stated that Rico "had an incident at school, that he had a detention at school, and he just attacked her." Green then spoke to Rico about the incident; he told Green that he attacked Bernadine "because he wanted something else to eat." Green detailed her conversation with Rico:

"He had eaten at 5:00 o'clock, and he had four hotdogs, and he wanted something else to eat. And when he wanted something else to eat, [Bernadine] was going to give it to him, but his granny got involved. [The grandmother] told him that [he] should be fed, not necessarily that he should get full."

Green testified that following a physical altercation between Bernadine and Rico, Rico went to the police station to report the incident. The police brought Rico back to the house, after which he was taken to Hartgrove. Green visited Rico at Hartgrove four days after the incident and observed some scratches on his neck. Rico told Green that he was scratched by Bernadine's fingernails when she held his neck. Rico told Green that he wanted to return home, but was afraid to go home. He told Green he wanted to go home because "[t]hat was his home, that was his mom."

¶ 34    Green testified to discussing the incident with her supervisor to determine DCFS's recommendation. Green's supervisor recommended that Rico be returned home to Bernadine "because the case [of possible physical abuse of Rico by Bernadine] was unfounded and that

he's not in any imminent danger." The supervisor recommended that additional services be put in place to provide closer monitoring, including a safety plan. Green testified that prior to the incident, Bernadine and Rico were attending family counseling; Rico was attending individual counseling and taking his medications. Green stated DCFS did not have any safety concerns for Rico if he were returned home.

¶ 35 The GAL questioned Green regarding Hartgrove's recommendations. Green testified that a DCFS Child and Youth Investment Team (CAYIT) meeting occurred on September 15, 2011, during which Hartgrove recommended that Rico be returned to Bernadine "with services in place and [monitoring] to regulate his medication to see if that would work." Hartgrove recommended outpatient therapy and a therapeutic day school. The GAL asked Green whether Rico had experienced any unusual incidents since being admitted to Hartgrove. According to Green, Bernadine had informed her that Rico had "tore some stuff on the wall," and that "[h]e and a peer got into it or something." Green stated she would follow up with Hartgrove to discuss the incidents related by Bernadine. The GAL asked Green whether her recommendation would be different if she learned that Rico had angry outbursts as recently as the previous Friday. Green answered, "No. That don't change my recommendation. That was my supervisor's recommendation."

¶ 36 Attorney Rathe then questioned Green. He asked, "What gives you any confidence that a 15-year-old boy who has obvious mental health issues would be willing to agree and stick to this [safety plan] contract" that DCFS had proposed? Green responded, "I don't know whether he will or not, but I know he wants to go home. So if he wants to go home and remain in the family, this is something that we have to talk to him about." Regarding the August incident that resulted in his hospitalization, Rico told her "the situation was okay about the food until granny got involved." Rico told Green that he never hit Bernadine, but "just held her against the wall." Rathe asked Green about the "significant damage" Rico caused to Bernadine's basement. Green stated that Bernadine told her Rico "was tearing up her house." Rathe then asked Green, "[C]ould [you] give Judge Sarley any confidence that Rico will not either be a danger to himself or a danger to others in light of his obvious situation here?" Green responded that DCFS completed an investigation and concluded the incident of possible abuse of Rico was unfounded. Rathe asked Green whether she could give any assurances that Rico's outbursts would not recur. Green answered, "I can't predict. Suppose he come[s] home and everything goes fine."

¶ 37 Rathe next asked Green whether anyone at the September 15, 2011 CAYIT meeting had provided suggestions "as to how to provide sufficient backup to [Bernadine] so she can make sure that she can cope with the situation." Green responded that the purpose of the CAYIT meeting was "just to go over the action plan, what was in the action plan. And it was not *** to discuss that, that [the Illinois Division of Child Protection (DCP)] was involved[, which] *** would make their [own] recommendations and their assessments of the case." Rathe asked, "Knowing, at some point, that Rico would be discharged from Hartgrove, had DCFS done anything to put additional services in place since services don't start just because people think they need to be started instantly? Has DCFS done anything to put additional services in place?" Green answered, "No, because Rico–We [were] waiting to hear from DCP and their investigation, whether he was coming home or not. DCP unfounded the case. So now

we can put services in place, additional services." According to Green, DCFS still had an open case for Rico, even though it was no longer Rico's guardian. Green stated that she could refer Bernadine and Rico back to the agency, "System of Care," so "if they need five days of therapy and [Bernadine's] agency can't provide it, then we'll use this agency to make up the slack."

¶ 38    Under questioning by DCFS, Green testified she did not ask Bernadine why she failed to notify DCFS of the August incident. Green stated Bernadine should have called her. Bernadine told Green that she contacted her lawyer instead. Green agreed that if Rico were returned home, part of the safety plan would require Bernadine to contact DCFS about any incidents. Green was unaware whether Rico was ready for discharge from Hartgrove. She did not have a discharge report, but would follow up with Hartgrove to determine its recommendations.

¶ 39    Rathe next called Bernadine to testify about the August incident. According to Bernadine, Rico wanted more food to eat. Bernadine told Rico that he had eaten enough and at approximately 8:40 p.m., she told him to go to bed. Bernadine stated, "The next thing was Rico blew up and said, 'I'm ready to eat. You can't tell me when I'm hungry. I'm still a growing boy.' " Bernadine told Rico that he needed to stop arguing and go to bed. Rico responded, "No," and ran into the back room where he threw macaroni and cheese from a package all over the floor. When Bernadine saw the macaroni on the floor, she told Rico "just go straight on to your room right now and go to bed." Rico ran to his bedroom and hit Bernadine with the door. Bernadine said to Rico, "[Y]ou're not going to hit me no more." At that point, Rico slammed the bedroom door. Bernadine opened the door. Rico said to Bernadine, "I did it. What you gonna do?" Rico then called Bernadine a "B." Bernadine said, "[E]nough is enough. Do we need to call the police?" Rico told Bernadine to "call who you want."

¶ 40    A physical altercation ensued in Rico's bedroom. Bernadine "got in Rico's face and said, 'You're gonna stop it right now. Calm down. Calm it down.' " Rico hit Bernadine's hand. She hit him back. Rico then kicked Bernadine. She hit him again. According to Bernadine, by this time, Rico "had [her] up against that closet that's in his room." She tried to pull away from him and "that's how he got the scratches on the back of his neck." Bernadine stated, "We started tussling. I get him to turn around, and I push him back up against the closet, and I said, 'Now calm it down right now.' " Rico ran back downstairs and said, "I'm about to call my people." He dialed the police and said he was being abused "because he could not get what he wanted to eat." Bernadine took the telephone away from Rico and asked the police to send an officer right away. Rico grabbed the telephone from Bernadine, ran to the basement, yelled into the phone, "Not, not, not," and threw the telephone down without disconnecting the call. He ran around the basement scattering clean clothes around, unscrewing light bulbs, and throwing the bulbs all over the basement. Bernadine picked up the telephone and told the police, "He's tearing up my basement." Rico then ran back upstairs to the main level of the house, grabbed his grandmother's four-pronged cane, poked a hole in the door leading to the foyer, and ran out of the house.

¶ 41    Bernadine called the police again and requested a police car be sent. Fifteen minutes later, the police arrived and investigated the scene. Bernadine told the police she wanted to

file an incident report. After the police officers left, Bernadine called the police again to report Rico as a runaway. Approximately 30 minutes later, the police returned with Rico; they suggested he be taken to Hartgrove Hospital. Bernadine accompanied Rico to Hartgrove, where he was admitted.

¶ 42 Bernadine testified that she attended the CAYIT meeting on September 15, 2011. She also contacted attorneys that specialize in finding services for children. She agreed that one of the options she had discussed with Rathe was whether the protective supervision order should be vacated to permit DCFS to resume custody of Rico. She stated she was against this option because she wanted Rico to return home. Rathe suggested to Bernadine that she explain to the judge how she would handle a similar incident: "[I]f Rico has a meltdown and you attempt to redirect him, and he gets out of hand, what are you going to do about that?" Bernadine responded, "[I]f it gets too far out of hand, [I would call] the police or the ambulance. That's what I was told to do. That's what I will do." Bernadine was asked, in the event of another meltdown, "are we going to be back where Rico calls the police, and then Rico is taken to Hartgrove again?" Bernadine responded, "I can't answer that. That depends on Rico."

¶ 43 Rathe asked Bernadine for her preferred outcome to the hearing. She stated, "I want to keep custody of my son. But I know my son has problems, and I want him to get some sufficient help." Bernadine said she wanted Rico to receive "[w]hatever help can be given to him that would help him be able to function normally and independently. I don't know what all that entails, but I know he needs it." Bernadine was asked if she was aware that so long as she has custody of Rico under an order of protective supervision, "DCFS is going to have limited ability to help you." Bernadine answered, "Yes, I found that out today." The following colloquy ensued between Bernadine and her attorney.

"Q. To a large extent, this is going to fall on you.

A. Yes.

Q. But do you want that to happen?

A. Yes. May I speak? If it entails me giving up custody of my child, yes.

\* \* \*

Q. And for the judge to vacate the order of protection and take Rico back into the system, you want to be Rico's guardian, and not DCFS?

A. Yes.

Q. Is that accurate?

A. Yes.

Q. And you understand that Rico is a handful?

A. Yes.

Q. But you want Rico–Rico will probably be discharged from Hartgrove in the next few days, and he's going to come home to you.

A. Okay.

Q. And you're ready to address all his needs?

A. I'm ready to do my best as a parent."

¶ 44    The GAL asked Bernadine whether she pressed charges against Rico. Bernadine stated she filed a police report but did not press charges. Bernadine stated that at no time following the August incident did she express not wanting to have Rico return home.

¶ 45    Under questioning by DCFS, Bernadine testified that the reason she did not contact DCFS immediately after the August incident was because she contacted her attorney. Bernadine explained that on prior occasions she had called Green and left messages on Green's voice mail, "and either nothing was done or no call was given back." Bernadine agreed that she was supposed to call the supervisor, whose number she had, if she was unable to reach Green.

¶ 46    The circuit court judge then questioned Bernadine. "[I]n your opinion, what needs to be done for Rico that's not being done now that will address or would address his situation with his behavior, his outbursts?" Bernadine responded, "I don't know exactly what he needs in terms of services. But therapy and medication are not correcting whatever is wrong. Whatever else can be offered, maybe that will help. But in terms of what do I know exactly, I don't know." The court then asked, "But whatever services he was doing or getting–Whatever services he was getting before this happened, you don't think are doing the job?" Bernadine answered, "No, sir." In answering additional questions from the circuit court, Bernadine testified that she had other arguments with Rico since he returned home in mid-June but the arguments did not escalate to the level of the late August incident.

¶ 47    Following Bernadine's testimony, the judge asked whether any party had additional evidence to present. The DCFS caseworker suggested continuing the case to obtain Hartgrove Hospital's discharge report, which she expected would include recommendations for Rico. The DCFS caseworker explained:

"I don't know if we leave the minor at home whether it would be a successful return home. I just don't want to have the case come back in, and we didn't have everything that we needed to have in order to make a proper recommendation or decision. *** I think it's important to have that discharge report before we can state what our positions are going to be."

The judge responded:

"Well, it seems pretty obvious to me that something else, something more than what was occurring before has to happen now in order for him to stay home, or this is just going to happen again. And I'm just like [Bernadine], I don't know–I can't say what the answer is. I'm not a professional as far as that goes. *** But anyway, there needs to be some evaluation or some recommendations put into place after an evaluation before he can be safely returned home. I suppose that's a start, getting the discharge recommendations."

¶ 48    The GAL expressed concern that "everybody is waiting for everybody else. The hospital is waiting for us to say, 'Okay. He's going home.' [We are asking,] 'What are the recommendations when he goes home,' not, 'Do you think he should go home.' " The GAL noted the hospital discharge report would probably not provide real insight for the next step for Rico, which the court had to determine. According to the GAL, the section 2-24 order of protection should be vacated, though responding "as his attorney, Rico definitely wants to

go home." The GAL stated that if the section 2-24 order were vacated, she would ask the court to order an emergency CAYIT meeting to develop a placement recommendation.

¶ 49    DCFS responded that Rico "would have to stay at the hospital until a placement could be located for him. It could take a long period of time."

¶ 50    The State agreed that the order of protective supervision should be vacated.

¶ 51    Rathe argued that Bernadine "feels very strongly about not vacating the order." Rathe continued:

> "But in terms of the best interest of Rico, I'm not–I've told this to [Bernadine] many times that I'm concerned that if Rico comes home without sufficient resources, there could be problems. I said that to her at the CAYIT meeting. I am very concerned she doesn't have the backup that she needs now. But she wants Rico home, so that's my position."

¶ 52    Following arguments of the parties, the judge issued his ruling.

> "All right. Well, then here's what I'm going to do. From what I've heard, there is a safety issue involved if Rico were to be returned home without anything else being done. And because of that, somebody could get hurt. I'm not sure if it's Rico. I'm not sure if it's Rico's mother. I don't know if it's Rico's grandmother. But somebody could get hurt.
>
> And until his needs are addressed so that he can safely be returned home, I don't think it's in anybody's best interest to return him home. So I'm going to vacate the order of protection and return him to the custody of DCFS."

¶ 53    The court vacated the section 2-24 protective supervision order of June 17, 2011, which reverted custody of Rico to the custody of the DCFS Guardianship Administrator. DCFS was directed to hold an emergency CAYIT meeting within seven days to address Rico's placement and the services he would be provided. A modified dispositional order under section 2-27 of the Act was also entered. The order provided (1) Bernadine is "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor", (2) reasonable efforts have been made to prevent or eliminate the need for Rico's removal from Bernadine's home, (3) appropriate services aimed at family preservation and family reunification have been unsuccessful, and (4) it is in the best interests of Rico to remove him from the custody of Bernadine. The case was set for a hearing on November 9, 2011, regarding the status of services and Rico's actual placement.

¶ 54    Bernadine filed a timely notice of appeal from the dispositional order entered on September 27, 2011.

¶ 55                                    ANALYSIS

¶ 56    Bernadine submits in an overarching contention that "at the heart of this case is a pervasive misunderstanding, made by many actors in the child welfare system and the legal system, about proper care and treatment of a child who has intensive psychiatric needs." Bernadine argues that the circuit court applied a "forced custody relinquishment policy" to Rico. According to Bernadine, the circuit court "mistakenly assumed [the policy] to be reasonable and 'best' for children with severe mental health needs." The policy "require[s]

their parents to forfeit legal custody and guardianship of their children to enable children to access treatment and protect them from harming themselves and their family members." As evidence of this policy, Bernadine points to the circuit court decision to "substitute" its judgment as to Rico's best interests for Bernadine's, which "gave short shrift" to Rico's interests in maintaining his familial relationships. According to Bernadine, the best interests factors applicable to Rico's circumstances do not support the court's decision to remove Rico from Bernadine's custody. Bernadine also asserts the court improperly vacated the section 2-24 protective supervision order when Bernadine was never accused of violating the order. Bernadine argues the "no-fault" adjudication that occurred here cannot lawfully serve as a basis for an involuntary removal of a child from an otherwise fit parent. As an alternative contention, Bernadine argues the court's decision to return Rico to DCFS guardianship, as being in his best interests, is against the manifest weight of the evidence. Finally, Bernadine argues her constitutional right to effective assistance of counsel was violated by counsel's representation at the hearing on September 27, 2011.

¶ 57                    Section 2-24 Protective Supervision Order

¶ 58        As made clear in her main brief, Bernadine asserts the best interests determinations by the circuit court on September 27, 2011, must be viewed in light of its ruling on June 11, 2011, terminating DCFS guardianship and returning Rico to Bernadine's custody. Bernadine points to this order, her "clear wishes" to keep legal custody of Rico, and Rico's own desire to remain in his mother's custody, as evidence that the court's decision of September 27, 2011, operated on the legally and factually mistaken premise that Rico could be cared for only by superseding Bernadine's fundamental right of legal custody and guardianship of Rico. Citing *Troxel v. Granville*, 530 U.S. 57, 68 (2000), Bernadine asserts, "a fit parent is entitled to determine their [*sic*] child's best interests and fit parents are presumed to act in the best interests of their children."

¶ 59        Making a similar contention, the *amicus curiae* brief submitted by the Edwin F. Mandel Legal Aid Clinic asserts "no reason [exists that] a fit, willing, and able parent should lose custody so that her child can receive necessary mental health services." It notes that "[d]espite the lack of evidentiary support or written findings regarding either Bernadine's ability or Rico's best interests, the court took custody from Bernadine by completing a preprinted disposition order, on which it checked boxes indicating that it had made all requisite findings [under section 2-27]."

¶ 60        Both Bernadine and the *amicus* wrongly presume that the propriety of the circuit court's action turns solely on the proceedings held on September 27, 2011, in light of the juvenile court's decision to return custody of Rico to Bernadine on June 17, 2011. The court issued a protective supervision order as well on June 17 for a reason. The juvenile court determined that Rico's "health, safety and best interests" compelled the order. 705 ILCS 405/2-24(1) (West 2010). Rico's best interests remained the principal concern of the juvenile court. The entry of the protective supervision order meant Bernadine's ability "to care for, protect, train or discipline" Rico remained in question. Bernadine was directed to follow all the conditions of the protective supervision order, which remained in effect "until further order of the

-14-

Court." The juvenile court judge also informed Bernadine that if she "were to fail to meet any of the conditions or violate any of the conditions, one of the possible consequences could be that Rico would be removed from the home again." We reject Bernadine's suggestion that returning custody of Rico to Bernadine on June 17, 2011, was the equivalent of closure of the case, which required the juvenile court to hold a new adjudicatory hearing, followed by a new dispositional hearing. See *In re P.P.*, 261 Ill. App. 3d 598, 602 (1994) (juvenile court retains "authority to make custodial changes during the period that the case is within the court's protective supervision").

¶ 61    In *P.P.*, the mother appealed the circuit court's decision to remove the newborn minor from her custody and return the minor to the guardianship of DCFS. *Id.* at 598. On appeal, the mother contended "that the court improperly removed P.P. from her custody without legal basis and without following the proper statutory procedure." *Id.* at 600. At the dispositional hearing following an adjudication that the minor was neglected under section 2-14 of the Act (705 ILCS 405/2-14 (West 1992)), the court returned custody of P.P. to the mother under an order of protective supervision pursuant to section 2-24 and set the matter for a progress report approximately 60 days later. *P.P.*, 261 Ill. App. 3d at 599. On the date of the progress report, the court was informed that the minor had been hospitalized for a severe burn caused by the immersion of her hand into hot water. "Because neither the DCFS worker nor the guardian *ad litem* (GAL) had been aware of the injury until the hearing date, the court continued the hearing *** [for four days]." *Id.* At the request of the GAL, the matter was continued for an additional four days to permit the filing of a supplemental petition to determine whether the minor should be removed from the mother's custody. In addition to the supplemental petition by the GAL, DCFS filed a supplemental petition alleging the mother violated the protective supervision order. *Id.* at 600. A hearing was held on both petitions. *Id.* The court found the scalding burn, while not intentional, "constituted evidence that P.P. was neglected." *Id.* "The court then vacated the section 2-24 order of supervision and appointed [DCFS Guardianship Administrator] guardian with the right to place. It is this order that is being appealed." *Id.*

¶ 62    The first issue the *P.P.* court addressed was "whether [the] juvenile court followed proper statutory procedure when it [vacated the section 2-24 order and placed P.P. in the custody of DCFS]." *Id.* at 600. The juvenile "court seemed to indicate that it was acting under the authority it possessed by virtue of the section 2-24 order of protective supervision and that, by vacating the section 2-24 order, custody 'reverted' to [the guardian administrator of DCFS]," which the mother disputed. *Id.* at 601. The *P.P.* court noted, as we do in this case, that there exists "some confusion or lack of clarity regarding the procedural authority upon which the [juvenile] court was relying." *Id.* The court stated that "the petitions for supplemental relief would have been more properly termed petitions for a change of custody," suggesting that the petitions in the record were not labeled as such. *Id.* In any event, the *P.P.* court did not hold that a change-of-custody petition was mandated by the Act. Rather, the *P.P.* court noted that the minor "had already been adjudicated a neglected child and was a ward of the court who had been returned to the custody of her mother under an order of protective supervision." *P.P.*, 261 Ill. App. 3d at 601. The court held that under these circumstances, "a court has the authority to retake custody of a minor upon a determination

-15-

that the section 2-24 order of protective supervision had been violated and that circumstances and the best interests of the child warranted such action." *Id.*

¶ 63      The *P.P.* court rejected the mother's contention that section 2-24 did not authorize the custodial change.

> "[R]eading section 2-26 [regarding the enforcement of orders of protection] in conjunction with the subsequent section 2-28 shows that the court does have the authority to make custodial changes during the period that the case is within the court's protective supervision.
>
> We conclude that the juvenile court may, at the time it conducts a court review of a case in which a minor has already been adjudicated abused and/or neglected, been made a ward of the court and placed under the protective shield of a court order of supervision, alter custodial placement if the circumstances and best interests of the child warrant." *Id.*

We find *P.P.* dispositive of Bernadine's contentions.

¶ 64      Before this court, Bernadine's brief premises her challenge of the juvenile court's rulings of September 27, 2011, on the court's decision of June 17, 2011, to terminate DCFS's guardianship of Rico and return custody to Bernadine. However, our review extends to the entire record of the juvenile proceedings. This includes the court's findings on March 17, 2010, of an urgent and immediate necessity to remove Rico from Bernadine's home based on the emotional and behavioral problems that resulted in four separate hospitalizations since June 2008, following the last of which Bernadine refused to pick up Rico. At the adjudication hearing on October 19, 2010, on a stipulation to the facts by the parties, the court found Rico to be a dependent minor "through no fault, neglect, or lack of concern" of Bernadine. At the initial dispositional hearing on November 9, 2010, the court determined Rico's best interests were served by adjudging him a ward of the court, with DCFS guardianship. The juvenile court found Bernadine unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline Rico. Bernadine, though informed of her appeal rights, did not challenge the ruling. As a final order, the juvenile court's rulings on November 9, 2011, became the law of the case. See *In re April C.*, 345 Ill. App. 3d 872, 974-75 (2004) (the court rejected the respondent's challenge to the juvenile court's finding of parental unfitness, which it based "in part, on the prior determinations of abuse and wardship").

¶ 65      We reject Bernadine's implicit claim that before the juvenile court could exercise its discretion to act in the best interests of Rico on September 27, 2011, it was required to begin the statutory procedures under section 2-27 anew, when no final closing and discharge of the proceedings occurred. A juvenile "court has authority to retake custody of a minor upon a determination that the section 2-24 order of protective supervision had been violated and that circumstances and the best interests of the child warrant such action." *P.P.*, 261 Ill. App. 3d at 601. While it may have been better had the court below required the filing of a petition "for a change of custody [now] pursuant to section [2-28(4)]," as *P.P.* stated (*id.*), before the court issued its ruling on September 27, 2011, we find no statutory mandate that such a petition be filed. *Id.* Nor does Bernadine assert such a contention. We observe, as well, that Bernadine never objected to the court's rulings based on the absence of a "change of

-16-

custody" supplemental petition or of a supplemental petition alleging a violation of the protective supervision order, which forecloses any such claim before this court. See *In re Yasmine P.*, 328 Ill. App. 3d 1005, 1011 (2002) (argument made for the first time on appeal is forfeited). We note that had Bernadine demanded the filing of such supplemental petitions, once it became clear that the juvenile court was being asked to consider vacating the section 2-24 order, it would have been a simple matter to postpone the September 27 hearing. See *P.P.*, 261 Ill. App. 3d at 599-600; *People v. Bynum*, 257 Ill. App. 3d 502, 514-15 (1994) (a timely and specific objection allows for a reasonable opportunity to correct a deficiency). Nor is there any real dispute that Bernadine violated the protective supervision order by not calling DCFS within 24 hours of Rico's hospitalization in August 2011. The juvenile court notified Bernadine on June 17, 2011, that if she "were to fail to *** violate any of the conditions [of the protective supervision order], one of the possible consequences could be that Rico would be removed from the home again." In any event, Bernadine fails to inform this court how the filing of a petition for a change of custody or one alleging a violation of the protective supervision order would have changed the outcome below.

¶ 66    Nor was the juvenile court's finding of Rico as a dependent minor under section 2-4 of the Act on October 19, 2010, effectively undone by the court's decision to return custody of Rico to Bernadine on June 17, 2011, under an order of protective supervision. As the court in *P.P.* made clear, a juvenile court retains "authority [under section 2-28] to make custodial changes during the period that the case is within the court's protective supervision." *P.P.*, 261 Ill. App. 3d at 602. That is precisely what the court did in this case. The court ruled, in the exercise of its discretion, that Rico's best interests warranted the protective supervision order of June 17, 2011, be vacated, which necessarily reverted Rico's custody to DCFS.

¶ 67    Nor do we agree with Bernadine's implicit claim that the juvenile court made an unequivocal finding of fitness of Bernadine on June 17, 2011, when it changed guardianship of Rico from DCFS to Bernadine. On May 9, 2011, the court entered a new permanency goal of return home within five months. The court found Bernadine and Rico "in need of continued services geared toward re-unification." On June 17, 2011, while the court ruled favorably on Bernadine's motion to return Rico to her home, the court made clear that Rico required continued services. On the basis of the positive reports by Lydia Home and DCFS and the representation that adequate services would be provided to Bernadine, including having Rico seen by a psychiatrist, the court ruled: "[I]t is no longer in the best interest of the minor to be a ward of the state." The court, however, entered the order of parental protective supervision under section 2-24 of the Act, which compelled Bernadine to provide proper care to Rico, cooperate with all reasonable requests of DCFS, and notify DCFS within 24 hours of Rico receiving professional medical treatment. Bernadine signed the order of protective supervision, which remained in effect "until further order of the Court." While guardianship of Rico was changed from DCFS to Bernadine, concerns over Rico's health, safety, and best interests prompted the court to enter the protective order.

¶ 68    Bernadine's citation to the decision of the United States Supreme Court in *Troxel*, 530 U.S. 57, for her overarching claim that the juvenile court improperly substituted its judgment regarding Rico's best interests for Bernadine's is simply misplaced. In that case, the Supreme Court reviewed the constitutionality of a Washington state statute that permitted "[a]ny

person" to petition for visitation rights " 'at any time' " and authorized the state superior courts to grant such rights whenever visitation would serve a child's best interests. *Id.* at 60. Petitioners Jenifer and Gary Troxel sought the right to visit their deceased son's daughters. *Id.* at 60-61. Respondent Tommie Granville, the girls' mother, did not oppose all visitation, but objected to the degree of visitation sought by the Troxels. *Id.* Granville appealed the superior court's order granting more visitation than she considered in her daughters' best interests. *Id.* at 61. The Washington Court of Appeals reversed and dismissed the Troxels' petition. *Id.* at 62. The state supreme court affirmed, holding that the statute unconstitutionally infringed upon a parent's fundamental right to rear her children. *Id.* at 62-63. The state supreme court reasoned that the United States Constitution permits a state to interfere with the parents' fundamental right only to prevent harm or potential harm to the child and found that the statute did not require a threshold showing of harm and was too broad in its scope. *Id.* at 63. The *Troxel* Court affirmed. *Id.* The Court explained, "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Id.* at 72-73.

¶ 69　　　The instant case is outside the confines of *Troxel*. The case before us falls within the exception that permits a state to interfere with a parent's fundamental right to rear a child in order to prevent harm to the child. The showing made in this case at the adjudication hearing on October 19, 2010, and in the dispositional order of November 9, 2010, satisfied the requirements under due process arising from the fundamental rights of any parent to rear her child. We reject the implicit notion that the juvenile court on September 27, 2011, was required to take steps beyond those spread of record on October 19 and November 9 when Rico was adjudged a dependent minor and made a ward of the court. Although the order of June 27, 2011, returned custody of Rico to Bernadine, the juvenile court retained jurisdiction over the parties to act in Rico's best interests "until further order of the Court." The June 27 order did not reset the due process clock to require more than what the juvenile court did here on September 27. Rico's case was never closed, though that was the intended purpose of the September 27 court hearing had the August incident resulting in Rico's fifth hospitalization not occurred. However, just as the parties were properly before the juvenile court on September 27, the juvenile court was well within its authority to act in Rico's best interests by vacating the protective supervision order over Bernadine's objection, which reverted guardianship of Rico to DCFS. *P.P.*, 261 Ill. App. 3d at 602.

¶ 70　　　Nor do we agree with Bernadine's contention that a petition alleging a violation of the protective supervision order was statutorily required. Notably, Bernadine provides us no authority to that effect. Nor does she claim that she abided by all the terms of the protective supervision order. The record makes it indisputable that Bernadine did not call DCFS within 24 hours of Rico's hospitalization. The record also establishes, based on Bernadine's own testimony, that the late August incident brought to light Rico's need for additional services. Given that Bernadine was found, through no fault of her own, unfit or unable to care for Rico at the adjudication hearing in October 2010, the testimony she gave on September 27, 2011, was more than sufficient to prove by a preponderance of the evidence that she was once again unable to care for Rico. The juvenile court's action taken on September 27, 2011,

-18-

based on Rico's best interest followed from its earlier "no-fault" dependency rulings, as characterized by Bernadine, in October and November 2010. None of the authority cited by Bernadine supports her contention that "the removal of children from parents over their objection" is not authorized under the facts and circumstances of this case. See *In re April C.*, 326 Ill. App. 3d 245, 256 (2001) ("Pursuant to section 2-27 of the Juvenile Court Act of 1987, a minor may be adjudged a ward of the court and custody taken away from the parents where it is determined that the parents are either unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline a minor ***." (citing 705 ILCS 405/2-27(1) (West 1998))). Bernadine was given ample opportunity to be heard by the court on September 27, 2011.

¶ 71    In the final analysis, however, we are presented with no authority that mandates a petition termed "for a change of custody" or one alleging a violation of section 2-24 of the Act be filed before a juvenile court may act in the best interests of a minor placed in its "protective supervision." *P.P.*, 261 Ill. App. 3d at 602. Most importantly, no showing has been made as to how the filing of such a petition would have changed the outcome below.

¶ 72    Nor do we accept the contention of the *amicus curiae* that the juvenile court acted on September 27, 2011, "solely on the mental health needs of the child." While we agree with the *amicus* that "[a] child's mental health needs cannot [alone] render a parent 'unable,' " for purposes of section 2-27, a juvenile court may find a parent "unable" to meet the needs of a child with mental health problems when the child is effectively "locked" out of the home, as occurred here following Rico's fourth hospitalization in March 2010. A juvenile court has authority to reenter such a finding by issuing a *modified* dispositional order at a progress report hearing, after the court has heard all the evidence offered by the parties, where nearly two years of supportive services have been provided. The question before the juvenile court on September 27, 2011, was whether Rico's best interests would be served by reverting custody to DCFS. The record amply supports the juvenile court's answer of yes.

¶ 73    Rico came to the attention of DCFS because of his mental health needs. On Rico's fourth hospitalization, DCFS was informed that Bernadine refused to pick up Rico after he was medically cleared for discharge from Hartgrove Hospital. At the time, Bernadine informed DCFS that she could not handle Rico's behavior or keep him at home. The juvenile court awarded temporary custody of Rico to the DCFS Guardianship Administrator and DCFS placed Rico with Lydia Home. Rico was hospitalized for the fifth time in late August 2011, following his "meltdown" at Bernadine's home. At the court hearing on September 27, 2011, Bernadine testified that she wanted Rico to receive "[w]hatever help can be given to him that would help him *** function normally and independently." Bernadine acknowledged that Rico "needs" that help. In response to questions by the juvenile judge, Bernadine stated, "[T]herapy and medication are not correcting whatever is wrong [with Rico]." To the court's explicit question, "Whatever services he was receiving before this happened, you don't think are doing the job?", Bernadine answered, "No, sir."

¶ 74    We reject any application to the circumstances present in this case the contention in the *amicus* brief that "if there are appropriates services that have not yet been tried, a court cannot find those services have failed." That services "not yet" tried cannot be found to have failed is undeniably true. The question before the juvenile court at the September 27 hearing

concerned whether Rico's best interests would be served by having additional services provided while in guardianship of DCFS or Bernadine. The court ruled Rico's best interests would be served by dedicating additional resources to Rico while in the guardianship of DCFS, as he was in 2010, "before he can be safely returned home." We stress that the court did not terminate Bernadine's parental rights. See *In re T.B.*, 215 Ill. App. 3d 1059, 1061 (1991) ("the term 'unfit' in the section relating to removing custody and guardianship from a parent following a finding of neglect differs in meaning from the unfitness required to be found for termination of parental rights for purposes of appointing a guardian with consent to adopt").

¶ 75   The court's ruling vacating the protective supervision order, which had placed guardianship of Rico with Bernadine, was neither against the manifest weight of the evidence nor an abuse of discretion.

¶ 76   We make clear what we intimated above. There is no merit to the argument by Bernadine that notwithstanding the unchallenged 2010 finding under section 2-27, before guardianship of Rico could be returned to DCFS as a matter of his own best interest, new findings under section 2-27 had to be made where Rico was in Bernadine's custody from June 17, 2011, until she hospitalized Rico a little more than two months later in August 2011. In a proceeding that results in the entry of a dispositional order under section 2-27, the circuit court must make three findings:

"(1) the parents are unfit or unable for reasons other than financial circumstances alone or are unwilling to care for, train, protect, or discipline the minor; *and* (2) services aimed at family preservation and reinforcement have been unsuccessful in rectifying the conditions leading to findings of unfitness or inability; *and* (3) the best interests of the minor require custody be placed with someone other than the parents. [Citation.]" (Emphases in original.) *Id.* at 1062.

¶ 77   On September 27, 2011, following the evidentiary hearing, the juvenile court entered a *modified* dispositional hearing because the adjudicatory ruling in October 2010 was unaffected by the transfer of guardianship of Rico from DCFS to Bernadine on June 17, 2011. We are unpersuaded that more than occurred here was required of the juvenile court to act in Rico's best interests. "A parent's right to custody of the child does not prevail where the court has determined such custody would be contrary to the best interests of the child." *Id*.

¶ 78   We reject the notion that whenever guardianship is returned to a parent the juvenile court's knowledge of the proceedings, including explicit findings under section 2-27 and the conditions of a section 2-24 protective supervision order, must be set aside before the court may act in the best interests of the minor. There is no authority for that proposition; we find that proposition contrary to the primary purpose of the Act to protect the welfare of minors. *In re Austin W.*, 214 Ill. 2d 31, 50 (2005).

¶ 79   Nor do we agree that a finding of "unable" under section 2-27 must be grounded exclusively on a parent's lack of aptitude or attitude to care for the child, as the *amicus* contends. While this case might well fall under the rubric of a parent lacking the appropriate "aptitude due to an irremediable condition such as mental retardation" to permit a change in

custody under the rubric urged by the *amicus*, Bernadine coped as well as she could given Rico's emotional and behavioral problems. As we made clear above, Bernadine was at the end of her rope in dealing with Rico at the time he was hospitalized for the fourth time; we defer to the juvenile court in its decision that Rico's best interests would be served by returning guardianship to DCFS while additional services are provided, where no termination of parental rights is involved. We strongly disagree with the suggestion by Bernadine that the juvenile court acted precipitously in its ruling of September 27, 2011.

¶ 80    We conclude that the procedural posture of this case did not preclude the juvenile court from taking the action it did on September 27, 2011. While all parties would have been better served by the filing of supplemental petitions seeking a return of guardianship to DCFS and alleging a violation of the protective supervision order, we note neither precedent nor statute precludes the juvenile court from acting in conformity with Rico's best interests, even when Bernadine was not at fault for being unable to provide the care Rico needs. We conclude that the entry of a protective supervision order on June 17, 2011, permitted the juvenile court to enter a *modified* dispositional order following an evidentiary hearing on September 27, 2011, which more than supports the court's exercise of its wide discretion in considering evidence that is relevant and helpful to the court's determination of a proper disposition. *In re C.H.*, 398 Ill. App. 3d 603, 607 (2010).

¶ 81    Bernadine also challenges the juvenile court's ruling that Bernadine was "unable to care" for Rico as unsupported by the record evidence. She asserts: "The record is bereft of any factual or legal basis for the finding that Ms. L. was unable to care for R.L. at the time of the September 27, 2011 hearing." Bernadine quotes the Act's provision "that the court must '*put[ ] in writing the factual* basis supporting the determination of whether the parents, guardian, or legal custodian of a minor adjudged a ward of the court are unfit or are unable' " (emphasis in original) (quoting 705 ILCS 405/2-27 (West 2010)). Bernadine contends that the evidence spread of record on September 27, 2011, did not contain "specific findings as to Ms. L.'s inability to care for R.L."

¶ 82    As we made clear above, the record before this court is not limited to the proceedings on September 27, 2011, for good reason. The case began in 2010, and the dispositional findings entered on November 9, 2010, became final when no timely appeal was taken. Bernadine does not now challenge the court's initial dispositional order of November 9, 2010, placing Rico under DCFS guardianship; nor can she at this point in the proceedings. We are unpersuaded that a greater showing is required for the court's actions on September 27, 2011, under Illinois law than is present in the record before us.

¶ 83    Finally, we address in short order Bernadine's contention that her appointed counsel rendered ineffective assistance during the proceedings on September 27, 2011, before the juvenile court. While Bernadine argues her counsel "violated Rules 1.2 and 1.3 of the Illinois Rules of Professional Conduct and *** [his representation was] objectively unreasonable under Illinois law," we find nothing in the record to support her contentions. Ultimately, however, we reject the notion that had counsel engaged in the "minimal steps" urged by Bernadine's appellate counsel in this nontermination-of-parental-rights case, the outcome of the proceedings below would have differed. *Cf. In re W.L.W.*, 299 Ill. App. 3d 881, 885 (1998) ("parents are entitled to effective assistance of counsel in proceedings that seek

-21-

termination of their parental rights"). Nor do we accept appellate counsel's implicit claim that the juvenile court's decision to vacate the protective supervision order was influenced by questions put to Bernadine and the DCFS caseworker by Bernadine's trial counsel. The circuit court judge was intimately familiar with the case. As he did in each of his prior rulings, the juvenile court judge acted in Rico's best interests in exercising his discretion. We reject Bernadine's claim that trial counsel provided her with constitutionally deficient assistance. See *In re D.M.*, 258 Ill. App. 3d 669, 674 (1994) (the party alleging ineffective assistance bears a heavy burden to overcome the strong presumption that counsel acted reasonably in light of the totality of the circumstances).

¶ 84                                    CONCLUSION

¶ 85       Following adjudicatory and dispositional hearings in 2010, the juvenile court found Rico to be dependent under section 2-4 of the Act and adjudged him a ward of the court, with guardianship placed with DCFS. On June 17, 2011, guardianship of Rico was returned to his mother, Bernadine, under a protective supervision order pursuant to section 2-24 of the Act. On September 27, 2011, at the scheduled hearing for possible closure of the case, the court conducted an evidentiary hearing, after which it vacated the protective supervision order, which reverted custody of the minor to DCFS, and issued a modified dispositional order, which found Bernadine "unable" to provide for Rico. The juvenile court's rulings of September 27 were neither against the manifest weight of the evidence nor an abuse of discretion as the court properly ruled the minor's best interests warranted the court's action. Nor did Bernadine's appointed counsel render ineffective assistance of counsel.

¶ 86       Affirmed.

¶ 87       JUSTICE GORDON, dissenting.

¶ 88       Since there was no petition filed in this case to change custody, I must respectfully dissent. Although the majority acknowledges that "it would have been better" if the court had required the filing of a petition for a change of custody, the majority nonetheless places its stamp of approval on this action by affirming. *Supra* ¶ 80. By affirming, we are inviting it to happen, again and again.

¶ 89                                    BACKGROUND

¶ 90       First, I will sketch out the few facts needed to understand my concerns.

¶ 91       At age 37 and single, Bernadine, the mother in this case, decided to become a foster parent. She had been employed for over 20 years in the accounting department of the same corporation. She also had a four-bedroom, single-family home.

¶ 92       Rico was initially placed with Bernadine when he was 4 years old, and the adoption was complete when he was 10. At the same time, Bernadine also adopted Rico's younger brother, Rudolph. Rico will turn 16 this September.

¶ 93       Rico has serious mental health issues. When he was less than four years old, he was

physically abused and abandoned. He is bipolar, and he has attention deficit hyperactivity disorder, post-traumatic stress disorder and other problems. Nonetheless, there appears to be a strong bond between mother and child. At the last hearing, the guardian *ad litem* informed the court that all the child wanted was to go home and the mother, for her part, is fighting to keep custody.

¶ 94    After the mother had Rico hospitalized several times for psychiatric disorders and while Rico was in the hospital, the State filed a petition for adjudication of wardship and a motion for temporary custody. The petition alleged that Rico was dependent in that he was without proper care through no fault of his custodian.[1] On March 17, 2010, the court awarded temporary custody to DCFS. On April 12, 2010, Rico was released from the hospital and placed in a residential treatment facility due to his multiple mental health diagnoses. The assessment done during Rico's first month at the treatment facility stated that, if he could choose, Rico would "go back home" and that the mother was "invested in the child."

¶ 95    In this case, the juvenile court has issued three dispositional orders in all. The first dispositional order, on November 9, 2010, placed the child in DCFS guardianship with a return-home goal of 12 months. The mother later filed a motion to return the child home, and in response, on June 17, 2011, the court issued its second dispositional order, which returned custody to the mother and found that being a ward of the State was no longer in the minor's best interests. On June 17, the court issued two separate orders: the dispositional order described above; and an order of protective supervision that required the child to attend all psychiatric appointments and to take all prescribed medication, as well as other conditions. After the second dispositional order, Rico returned home but was rehospitalized.

¶ 96    On September 27, 2011, the case was scheduled for a proceeding to discharge the case. However, instead, the trial court issued its third dispositional order, which changed custody from the mother to DCFS. The trial court changed custody, even though there was no petition or motion pending to change custody and even though DCFS's counsel specifically asked that custody *not* change. Thus, the entity that was granted custody did not want it. DCFS's counsel also asked for a continuance to present additional evidence, which was also denied. DCFS's counsel warned that Rico "would have to stay at the hospital until a placement could be located" and this "could take a long period of time." It is this third dispositional order that is the subject of this appeal and that is troublesome.

¶ 97    On appeal, the mother argues that there is no reason for her to lose legal custody just so that her child can receive services and that she wants to participate in the decision-making process concerning his placement.

¶ 98    In addition, the mother challenges the September 27 hearing on the ground that the State failed to file a petition to change custody. For the reasons discussed below, I agree with the mother.

_____

[1]The majority states that the mother "characterized" the court's orders in October and November 2010 as "no-fault." *Supra* ¶ 70. This was not merely a party's biased characterization. For example, on October 19, 2010, the trial court found that the child was dependent "through no fault, neglect, or lack of concern" by the mother. (Internal quotation marks omitted.) *Supra* ¶ 19.

¶ 100        The centerpiece of the majority's opinion is the *P.P.* decision. *In re P.P.*, 261 Ill. App. 3d 598 (1994). The majority cites that decision for the proposition that the State did *not* have to file a supplemental petition for a change in custody or hold a hearing specifically on a change-in-custody petition (*supra* ¶¶ 60-65)–but that is exactly what was done in *P.P. P.P.* stands for the *opposite* proposition.

¶ 101        In *P.P.*, as in our case, the trial court returned custody of the child to the mother but entered an order of protective supervision. *P.P.*, 261 Ill. App. 3d at 599. In *P.P.*, as in our case, a new incident occurred after the protective order was entered. *P.P.*, 261 Ill. App. 3d at 599. However, completely unlike our case, the guardian *ad litem* (GAL) in *P.P.* asked for a continuance in order to file a supplemental petition and to hold a hearing on the specific issue of whether the child should be removed from the mother's custody. *P.P.*, 261 Ill. App. 3d at 599; see also *In re Austin W.*, 214 Ill. 2d 31, 41 (2005) (GAL filed a petition to change custody). As a result, our case lacked what the *P.P.* case had–notice. The September 27, 2011, hearing at which the mother in our case lost custody was scheduled to be simply the occasion for a progress report and a hearing to close the case. *Supra* ¶¶ 31, 69, 85. In fact, the court announced at the start of the hearing that it was "for progress report and possibly a motion to close the case." As a result, the mother was not given notice, prior to the hearing, that it was for the purpose of changing custody.

¶ 102        There is no question that, in *P.P.*, there was a petition filed seeking to change custody and a hearing held on the change-of-custody issue. First, the GAL in *P.P.* asked for a continuance specifically for the purpose of permitting the filing of a "supplemental petition" and "a hearing to determine whether P.P. should be removed from [the mother's] custody." *P.P.*, 261 Ill. App. 3d at 599. It would be odd to ask for a continuance specifically in order to file a petition about changing custody and then file a petition with content on a completely different topic. Second, the opinion states that the content of the petitions subsequently filed by both DCFS and the GAL did, in fact, ask for a change of custody, namely, that a DCFS administrator "be appointed guardian with the right to place" the minor. *P.P.*, 261 Ill. App. 3d at 600. Third, acting in response to the petitions' content, the trial court then held a hearing and did, in fact, change custody from the mother to DCFS. *P.P.*, 261 Ill. App. 3d at 600. Fourth, it was based on the petitions' substance and the ensuing hearing that the appellate court found that the petitions would have been "more properly termed" or labeled as what they actually were, namely, petitions for "change of custody," rather than simply "supplemental petitions." *P.P.*, 261 Ill. App. 3d at 600. Thus, these facts establish that the petitions in *P.P.* and the hearing held on them concerned change of custody. The appellate court did regret that the mislabeling and the lack of citation to specific statutory sections created "some confusion or lack of clarity," indicating that this would not be the best course of action to follow in the future. *P.P.*, 261 Ill. App. 3d at 601. However, at least in *P.P.*, the petitions gave the mother some notice. In our case, there was no petition at all, which led to even more "confusion" and "lack of clarity" (*P.P.*, 261 Ill. App. 3d at 601) and absolutely no notice was given.

¶ 103    In *P.P.*, the appellate court held that the lower court had the authority to change custody both: (1) pursuant to section 2-28 and the filed petition; and (2) "upon a determination that the *** order of protective supervision had been violated." *P.P.*, 261 Ill. App. 3d at 601. By contrast, in our case, (1) no petition was filed, and (2) the trial court never made a factual determination that the order of protective supervision had been violated. *Supra* ¶ 2 (the mother appealed the lack of a determination), ¶ 52 (the trial court's ruling shows that no determination was made), ¶ 65 (the majority makes its own factual finding that there is no real dispute about what the determination would have been if the trial court had made a determination), ¶ 78 (the majority rejects "the notion" that such a determination is required).

¶ 104    The majority's opinion finds that the mother waived this issue by failing to object at the hearing to the lack of a petition (*supra* ¶ 65)–but how can we fault her for failing to object to something that should have provided *her* with notice? What mother in her right mind would ask the State to file a petition to change her custody? More importantly, why would we, the appellate court, place the burden on a mother, who very much wants to keep her child, to ask the State to file a petition to change her custody?

¶ 105    It is absolute black-letter law that when a hearing is held to change custody, the burden of proof is on the person who filed the petition to show, by a preponderance of the evidence, that the change in custody is in the best interests of the child. *In re Austin W.*, 214 Ill. 2d at 51. Often, the person who files is the GAL. *E.g.*, *In re Austin W.*, 214 Ill. 2d at 33; *P.P.*, 261 Ill. App. 3d at 599. After the filing person presents her evidence and rests, then the person opposing the petition can decide whether to present opposing evidence. The trial court then issues its determination. It is then the job of the appellate court to decide whether the trial court's determination–that the filing person satisfied her burden–is against the manifest weight of the evidence. *In re Austin W.*, 214 Ill. 2d at 52. If no one filed a petition, then who bears the burden and how do we review whether the burden has been met?

¶ 106    In the case at bar, the GAL did not file a petition. At the conclusion of the hearing, counsel for DCFS requested a continuance to present further evidence before the court issued a ruling (*supra* ¶ 47), and that request was denied. The GAL stated that, although she thought that the order of protection should be vacated, she had to respond "as his attorney, Rico definitely wants to go home." Counsel for DCFS stated that DCFS wanted the child to remain at home with his mother, with services in place. The proceeding before us lacks a clear proponent and a clear order in the presentation of proof, and thus the issue of burdens cannot be determined. This shows why the filing of a petition is a good idea, because it clarifies the parties' burdens and the order of proof.

¶ 107    With all due respect, the majority also seems unclear about the burden of proof. The majority states repeatedly that "Bernadine fails to inform this court how the filing of a petition for a change of custody or one alleging a violation of the protective supervision order would have changed the outcome below." *Supra* ¶¶ 65, 71. The majority thus places the burden of proof on the mother, without any citation to law or case authority. The majority places the burden on the mother to show how the outcome would have been different if she had notice. However, it is black-letter law that the burden of the proof is on the person who filed the petition–certainly *not the mother* in this case–to show that the change in custody was in the best interests of the child. *In re Austin W.*, 214 Ill. 2d at 51. Thus, the burden is

-25-

on the State–not the mother–to show that the lack of notice did not affect the outcome. In the case at bar, the State cannot meet this burden considering that, without a petition before it alleging a violation of the protective order, the trial court failed to make any finding that a violation did or did not occur; and even DCFS believed that the change-of-custody decision was premature without the hospital records.

¶ 108    On this appeal, the mother objects to the fact that there was no petition of any kind filed in this case–neither a petition under section 2-28 to change custody (705 ILCS 405/2-28(4) (West 2010)),[2] nor one under section 2-26 to enforce the court's prior order of protective supervision (705 ILCS 405/2-26 (West 2010)).[3] In this case, the court entered two orders on June 17, 2011: a dispositional order that returned custody of the child to the mother and an order of protective supervision that required the child to attend all psychiatric appointments and to take all prescribed medication, as well as other conditions. These orders were entered in response to the mother's motion for a return-home disposition. Section 2-26, which is entitled "[e]nforcement of orders of protective supervision or of protection," provides for enforcement of protective orders through a contempt procedure. 705 ILCS 405/2-26 (West 2010).[4] On appeal, the mother objects on the ground that the lack of any type of petition cast the parties into a procedural swamp without a clear statutory compass. This is particularly troubling since, in this area of law, courts are authorized to act only according to statute. *In re Chara C.*, 279 Ill. App. 3d 761, 765 (1996). Where a court's power to act is controlled by statute, as it is here, the court is governed by the rules of limited jurisdiction and it may proceed only within the lines of the statute. *In re Chara C.*, 279 Ill. App. 3d at 765.

¶ 109    The lack of a petition also potentially raises concerns about our subject matter jurisdiction. A court has an independent duty to consider subject matter jurisidiction even when, as here, neither party raised it as an issue. Although a dispositional order is subject to modification until the final closing and discharge of the proceedings under section 2-31, section 2-23 requires that any such modification be "not inconsistent with Section 2-28." 705 ILCS 405/2-23(2) (West 2010); see also 705 ILCS 405/2-28, 2-31 (West 2010). In *In re Austin W.*, our supreme court emphasized that any modification must be done "in a manner consistent with the provisions of section 2-28," and then immediately quoted subsection (4)

---

[2]The majority holds that a petition for change of custody was not required and then claims "[n]or does Bernadine assert such a contention." *Supra* ¶ 65. In her brief to this court, Bernadine puts forth several reasons to reverse, including: "the requirements of Section 2-28 for seeking a change of custody of the minor *** were not followed; no petition for relief in accordance with any of these applicable juvenile court procedures under Sections 2-24, 2-26, or 2-28 was filed."

[3]In her brief to this court, the mother specifically claimed that the lower court failed to follow "the Juvenile Court Act's process for finding a violation" of the order of protective supervision. She further stated: "No petition to find a violation pursuant to Section 2-26 of the Act had been filed and no violation was alleged, let alone found."

[4]The majority's opinion criticizes the mother for failing to provide case law that the State should have filed a motion or citation to enforce the protective order. *Supra* ¶ 70. The Act itself provides for enforcement through a contempt procedure. 705 ILCS 405/2-26 (West 2010).

of section 2-28. *In re Austin W.*, 214 Ill. 2d at 43-44. Subsection (4) provides that "[t]he minor or any person interested in the minor may apply to the court for a change in custody." 705 ILCS 405/2-28(4) (West 2010). In the case at bar, there does not appear to be a formal application, either written or orally, by a "person" to "change" custody. 705 ILCS 405/2-28(4) (West 2010). Thus, although the dispositional order returning custody to the mother was subject to modification since no final order to discharge proceedings was ever entered, there is a question about whether the modification complied with section 2-28, as the Juvenile Court Act requires.

¶ 110    In addition, the September 27 hearing started out as a proceeding to discharge the case. *Supra* ¶ 69 (discharging the case was "the intended purpose of the September 27 court hearing"). Section 2-31, which governs this type of proceeding, provides that, as part of the final discharge order, the court may "*continue or terminate* any custodianship or guardianship." (Emphasis added.) 705 ILCS 405/2-31(2) (West 2010). Our legislature specifically chose *not* to use the word "change," which it had used previously in the Act–in section 2-28, for example. Thus, while the court could have "continue[d]" the mother's custody or "terminate[d]" the GAL's guardianship, the clear language of the section did not authorize the court to *change* custody from one custodian to another.[5]

¶ 111    There is even a question about whether the child was still a ward of the State. In its June 17, 2011, order, the juvenile court held that, while the child had been "previously adjudged a ward of the court," presently "[i]t is no longer in the best interest of the minor to be a ward of the state." As the State concedes in its brief to this court, without wardship, a juvenile court lacks the authority to enter dispositional orders concerning a minor.

¶ 112    The State argues that the mother waived her claim that the juvenile court lacked the authority to act when she did not object below. The State cites in support *In re William H.*, 407 Ill. App. 3d 858, 869-70 (2011). In that case, the mother challenged the merits of the wardship decision, not the juvenile court's authority to act. If a juvenile court lacks authority to act then it lacks authority, whether or not there is an objection, and the order is void; and if it lacks authority, so do we.

¶ 113    The majority observes that the mother chose not to appeal the first dispositional order, issued on November 9, 2010, which placed the child in DCFS guardianship with a return-home goal of 12 months. *Supra* ¶ 64. The opinion states that, since this was a final, appealable order, it then became "the law of the case." *Supra* ¶¶ 64, 81. Like the first dispositional order, the second dispositional order–which returned custody to the mother and found that being a ward of the State was no longer in the minor's best interests–was also a

_____

[5]The majority's opinion avoids the "change" issue by stating that, when the court vacated the June 17 protective order, custody passively "reverted" to DCFS. *Supra* ¶¶ 53, 69, 72. See also *supra* ¶ 1; *In re P.P.*, 261 Ill. App. 3d at 601 (criticizing the lower court for assuming that, by vacating the protective order, custody " 'reverted' " to DCFS). There were two separate orders entered on June 17: a protective order; and the second dispositional order. A court could certainly vacate a protective order while leaving a dispositional order in place. What gave custody to DCFS on September 27 was the third dispositional order that affirmatively *changed* custody from the mother to DCFS. *Supra* ¶ 53.

final, appealable order. *In re Austin*, 214 Ill. 2d at 44 ("dispositional orders are generally considered 'final' for purposes of appeal"). By the same token, when the State chose not to appeal, the second order then became the law of the case, superseding the first order, and the mother's choice not to appeal the first order became irrelevant.

¶ 114                                   CONCLUSION

¶ 115        Since the failure of anyone to file a petition to change custody resulted in a lack of notice to the mother, a confusing procedure and concerns about our subject matter jurisdiction, I must respectfully dissent.